**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| DARREL D. DAVIS, | : | Case No. 3:17-cv-106 |
| | : | |
| Plaintiff, | : | District Judge Walter H. Rice |
| | : | Magistrate Judge Sharon L. Ovington |
| vs. | : | |
| | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## REPORT AND RECOMMENDATIONS[1]

## I.    <u>Introduction</u>

Plaintiff Darrel D. Davis brings this case challenging the Social Security Administration's denial of his applications for Social Security benefits.  He applied for period of disability, Disability Insurance Benefits, and Supplemental Security Income in December 2013, asserting that he could no longer work due to a learning disorder, anger issues, lack of patience, problems with his right ankle, high blood pressure, and a double hernia.  The Social Security Administration denied Plaintiff's claims initially and upon reconsideration.  At Plaintiff's request, Administrative Law Judge (ALJ) Eric Anschuetz conducted a hearing where both Plaintiff and a vocational expert testified.  Shortly thereafter, the ALJ concluded that Plaintiff was not eligible for benefits because he is not under a "disability" as defined in the Social Security Act.

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings. The Commissioner asks the Court to affirm ALJ Anschuetz's non-disability decision.

The case is presently before the Court upon Plaintiff's Statement of Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #10), Plaintiff's Reply (Doc. #11), the administrative record (Doc. #7), and the record as a whole.

## II.   <u>Plaintiff's Background</u>

Plaintiff asserts that he has been under a "disability" since June 30, 2013. He was forty-one years old at that time and was therefore considered a "younger person" under Social Security Regulations. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c). He has a limited education. *See id.* §§ 404.1564(b)(3), 416.964(b)(3).[2]

At his administrative hearing before ALJ Anschuetz, Plaintiff testified that he only went to school through the ninth grade because he "just kept having problems and just [gave] up on it." (Doc. #7, *PageID* #90). He was "always in trouble" and "was always getting into stuff, fights and getting suspended …." *Id.* He was in special education classes and has been "made fun of all my life about being in the little short classes and riding the bus." *Id.* at 108, 111. He never obtained a GED. *Id.* at 90.

Although Plaintiff lives in a house by himself, he explained that he has never really lived independently because people are always checking in on him. *Id.* at 102,

---

[2] The remaining citations will identify the pertinent Disability Insurance Benefits Regulations with full knowledge of the corresponding Supplemental Security Income Regulations.

109-10. His girlfriend, sister, and brother each give him money and his girlfriend pays his bills. *Id.* at 101, 109. During a typical day, Plaintiff gets up and eats a sandwich and watches television. *Id.* at 98. He "sometimes" does laundry but does not do dishes. *Id.* at 99. He uses his girlfriend's computer to play games and he has a cell phone to call family. *Id.* at 96-97. His girlfriend signed him up for a Facebook account and he "sometimes" uses it. *Id.* at 97.

Plaintiff has a driver's license and drives "[e]veryday if I have to." *Id.* at 106-07. He drives to the store or his girlfriend's house. *Id.* at 107. He struggled to obtain a driver's license. He needed to take the oral exam four times before passing. *Id.* at 108.

Plaintiff's past work is varied. He worked as tow-truck operator for a few companies. *Id.* at 91-92. He also worked for a parts store and mowed grass for the City of Dayton. *Id.* at 92-93. He was terminated from most or all of them for absenteeism and/or poor performance. *Id.* at 92. Specifically, he was unable to keep up with the work demands and did not work or learn fast enough. *Id.* at 92-93.

## II.   The ALJ's Decision

As noted previously, it fell to ALJ Anschuetz to evaluate the evidence connected to Plaintiff's applications for benefits. He did so by considering each of the sequential steps set forth in the Social Security Regulations. *See* 20 C.F.R. § 404.1520. He reached the following main conclusions:

Step 1:     Plaintiff has not engaged in substantial gainful employment since January 1, 2019.

Step 2:      He has the severe impairments of status post open reduction and internal fixation of a right ankle fracture in 2000; anxiety disorder; borderline intellectual functioning, and obesity.

Step 3:      He does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4:      His residual functional capacity, or the most he could do despite his impairments, *see Howard v. Comm'r of Soc. Sec*., 276 F.3d 235, 239 (6th Cir. 2002), consists of "less for the full range of medium work …. Specifically, [Plaintiff] can lift and carry up to 50 pounds occasionally and up to 25 pounds frequently. He can stand and/or walk a total of six hours during an eight-hour workday. He can sit for six hours during the workday. He can only use his right lower extremity for occasional pushing and pulling. However, he has no problem driving a motor vehicle. He can occasionally climb ladders, ropes, and scaffolds, but he can frequently climb ramps and stairs. His ability to balance and stoop is unlimited. He can frequently kneel, crouch, and crawl. He is limited to performing simple, routine, repetitive tasks, but not at a production rate pace. He can have frequent interaction with supervisors."

Step 4:      He is unable to perform any of his past relevant work.

Step 5:      He could perform a significant number of jobs that exist in the national economy.

(Doc. #7, *PageID* #s 63-74). These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability. *Id.* at 74.

## IV.   **Standard of Review**

The Social Security Administration provides Disability Insurance Benefits and Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 423(a)(1), 1382(a). The term "disability"—as defined by the Social Security

Act—has specialized meaning of limited scope.  It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job—i.e., "substantial gainful activity," in Social Security lexicon. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).  Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings.  *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'"  *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . . ."  *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647,

651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.    Discussion

ALJ Anschuetz found that Plaintiff's borderline intellectual functioning does not meet the Listing 12.05C requirements for intellectual disability.[3] (Doc. #7, *PageID* #s 65-69). Plaintiff disagrees. (Doc. #8).

To meet the listing for intellectual disability, an individual's impairment must satisfy the diagnostic description in the introductory paragraph and any of the four sets of criteria. 20 C.F.R. § 404, Subpt. P, App. 1, § 12.00A. Listing 12.05C provides:

> Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.,* the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>                    .    .    .

---

[3] On August 1, 2013, the Social Security Administration amended Listing 12.05 by replacing the words "mental retardation" with "intellectual disability." *See* 78 F. Reg. 46,499, 46,501 (to be codified at 20 C.F.R. § 404, Subpt. P, App. 1). Despite this change, the ALJ misuses the term "mental retardation" repeatedly in his decision. *See, e.g.,* Doc. #7, *PageID* #67. His choice of terms does not substantively change the meaning. *See* 78 F. Reg. 46,499, 46,500 (The Administration stated that the change "does not affect the actual medical definition of the disorder or available programs or services.")

6

> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

20 C.F.R. § 404, Subpt. P, App. 1, § 12.05C. Thus, a plaintiff seeking to establish an intellectual disability under Listing 12.05C must prove three elements: (1) an IQ score between 60 and 70; (2) a second impairment causing work-related limitations; and (3) subaverage general intellectual functioning with deficits in adaptive functioning that began before age 22. *Id.*

In the present case, the ALJ found "that section 12.05 does not actually apply to the evaluation of [Plaintiff's] mental limitations, because [Plaintiff] has borderline intellectual functioning and not mental retardation." (Doc. #7, *PageID* #67). But, Listing 12.05C does not require a diagnosis of "mental retardation." As the Commissioner is usually quick to point out—and is correct as a matter of law to do so—a mere diagnosis does not establish that a claimant is under a "disability." *See, e.g., Landsaw v. Sec'y of Health & Human Servs.,* 803 F.2d 211, 213 (6th Cir.1986); *see also* 20 C.F.R. § 416.927(e)(1); *cf. Higgs v. Bowen,* 880 F.2d 860, 863 (6th Cir.1988) ("The mere diagnosis of arthritis, of course, says nothing about the severity of the condition."); *Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 341 (6th Cir. 2013) ("the ALJ's finding that he had borderline intellectual functioning, a lesser diagnosis than mental retardation, does not rule out the possibility of a finding of mental retardation. ...").

Requiring such a diagnosis in cases of intellectual disability would place formalism over substantive evidence, especially where the plain language of Listing 12.05C does not

specifically require a claimant to produce evidence from a medical source diagnosing intellectual disability. Thus, instead of requiring evidence of a diagnosis, the correct analysis focuses on whether the evidence of record meets or equals Listing 12.05's introductory paragraph and Listing 12.05C's criteria. *See Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); *Breitenstein v. Astrue*, No. 3:10cv32, 2011 WL 1234902 (S.D. Ohio Mar. 30, 2011) (Rice, D.J.).

Further, the ALJ found that the opinions of both State agency record-reviewing psychologists, Irma Johnston, Psy.D., and Carl Tishler, Ph.D., support his conclusion. (Doc. #7, *PageID* #67). This reliance is misplaced as neither psychologist considered Listing 12.05C. *Id.* at 130-31, 149-50.

*IQ Score*

The record contains the results of three seperate intelligence tests. In September 1981—when Plaintiff was nine years old—on the Wechsler Intelligence Scale for Children – Revised (WISC-R), Plaintiff received a full scale IQ of 76, verbal IQ of 78, and performance IQ of 78. *Id.* at 388. A little over three years later, on the WISC-R, he obtained a full scale IQ of 74, verbal IQ of 67, and performance IQ of 85. *Id.* Then, in May 2014—in association with the present case—Dr. Mary Ann Jones administered the Wechsler Adult Intelligence Scale – Fourth Edition (WAIS-IV). *Id.* at 359. Plaintiff received a full scale IQ of 65, verbal comprehension index of 63, and perceptual reasoning index of 79. *Id.*

The ALJ disregarded the most recent IQ scores. He concluded, "based on the inconsistencies between Dr. Jones['s] IQ test scores and his previous test scores, I am convinced that he does not have a <u>valid</u> full-scale IQ of 60 through 70 with another impairment that imposes a significant work-related limitation of function." *Id.* at 67. He further discounted the score because "Dr. Jones did not state whether she believed [Plaintiff] put forth his best effort on this this test, and it appears he did not, in light of his earlier IQ test scores." *Id.* at 71-72. There are several errors in this conclusion. First, as acknowledged by the Commissioner, the ALJ overlooked or ignored that Plaintiff's 1984 verbal IQ score of 67 is not inconsistent with his 2014 verbal comprehension index of 63. *See* Doc. #10, *PageID* #418. Second, the ALJ must have also ignored or overlooked Dr. Jones's statement that Plaintiff "willingly attempted assigned tasks and appeared to give good effort throughout the evaluative process. He stayed with tasks, but it was clear he did not always understand what was being asked of him." (Doc. #7, *PageID* #359).

Last, the Regulations require a plaintiff to show "a valid verbal, performance, **or** full scale IQ of 60 through 70 …." 20 C.F.R. § 404, Subpt. P, App. 1, § 12.05C (emphasis added). And, "In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, [the Social Security Administration] use[s] the *lowest* of these in conjunction with 12.05." 20 C.F.R. Pt. 404, Subpt. P. App. 1, § 12.00(D)(6)(c). Plaintiff's lowest verbal IQ of 67 obviously falls into the range required by the listing.

*Additional and Significant Work–Related Limitation*

Plaintiff has also shown that he has other impairments that impose an additional and significant work-related limitation of function. The ALJ found that in addition to Plaintiff's borderline intellectual functioning, his severe impairments included status post open reduction and internal fixation of a right ankle fracture in 2000; anxiety disorder; and obesity. (Doc. #7, *PageID* #65).

These findings demonstrate that Plaintiff satisfies Listing 12.05C's requirement of an "additional and significant work-related limitation of function." The Regulations explain, "For paragraph [12.05]C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, *i.e.,* is a 'severe' impairment(s), as defined in §§ 404.1520(c) and 416.920(c)." 20 C.F.R. § 404, Subpt. P, App. 1, § 12.00(A). Consequently, the ALJ's determination at Step 2 that Plaintiff had several "severe" impairments under § 404.1520(c) effectively determined that these impairments imposed "additional and significant work-related limitation of function" in satisfaction of Listing 12.05C.

*General Intellectual and Adaptive Functioning*

The introductory paragraph of Listing 12.05 requires that the individual show "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period." 20 C.F.R. § 404, Subpt. P, App. 1, § 12.05. Intellectual functioning includes tasks such as "reasoning,

problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience," AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 33 (5th ed. 2013) (DSM-5).

In the present case, Plaintiff's IQ scores and school records demonstrate subaverage intellectual functioning that began during his developmental period. As noted above, when Plaintiff was thirteen years old, on the WISC-R, he obtained a verbal IQ of 67, performance IQ of 85, and full-scale IQ of 74. *See West v. Comm'r of Soc. Sec.*, 240 F. App'x 692, 698 (6th Cir. 2007) ("the claimant *may* use a qualifying IQ score before the age of 22 to demonstrate that his subaverage intellectual functioning initially manifested during his developmental period ….") (emphasis in original) (citing *Daniels v. Comm'r of Soc. Sec.*, 70 F. App'x, 868, 873 (6th Cir. 2003)).

His school records are consistent with his scores. For example, the school psychologist noted in 1984 that Plaintiff "performed within the 'developmentally handicapped' range on the [WISC-R]" and he "continues to function significantly below grade level." (Doc. #7, *PageID* #395). Although he was in seventh grade, his reading skills were at a mid-fourth grade level and his math skills were at an early-fourth grade level. *Id.* Further, his ninth-grade school records show he was under an Individualized Education Plan and placed in the Developmentally Handicapped program. Plaintiff did not graduate from high school and has never obtained his GED.

Plaintiff's more recent records are consistent with his school records. In 2014, Plaintiff obtained a full-scale IQ of 65, which, according to Dr. Jones, "falls in the mild

range of mental retardation." *Id.* at 359. Further, Dr. Jones noted, "There were some problems with comprehension of questions asked of him during the interview process. Stream of thought proved retarded. Thought association proved circumstantial." *Id.* at 357. Together, this evidence demonstrates Plaintiff has significantly subaverage general intellectual functioning that began before he was twenty-two years old.

Turning to adaptive functioning, "Deficits in adaptive functioning … refer to how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background." DSM-5 at 37. An individual demonstrates deficits in adaptive functioning consistent with intellectual disability "when at least one domain of adaptive functioning— conceptual, social, or practical—is sufficiently impaired that ongoing support is needed in order for the person to perform adequately in one or more life settings at school, at work, at home, or in the community." *Id.* at 38.

Looking first at the practical domain—it "involves learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, and school and work task organization." DSM-5 at 37. ALJ Anschuetz's discussion of deficits in adaptive functioning focuses primarily on the practical domain. He concluded, "In the case of this claimant, with respect to his level of adaptive functioning, he is not dependent on others for personal needs such as toileting, eating, dressing, or bathing and he has not shown an inability to follow directions at the CE or in his past work activity; therefore, he does not meet subsection

[A] of section 12.05.  He is able to follow directions as shown by his ability to complete

tests at the CE and to work at a semiskilled job as a tow truck driver."  (Doc. #7, *PageID*

#67).

The ALJ's reasoning is flawed.  Individuals with intellectual disabilities are

capable of the personal care and household tasks performed by Plaintiff.  For instance, a

person with a mild intellectual disability "may function age-appropriately in personal

care" but "need some support with complex daily living tasks in comparison to peers ...

[such as] grocery shopping, transportation, home and child-care organization, nutritious

food preparation, and banking and money management."  DSM-5 at 34; *see Brown v.

Sec'y of Health & Human Servs.*, 948 F.2d 268, 270 (6th Cir. 1991) (concluding that the

claimant's ability to use public transit, have a driver's license, make change at a grocery

store, do laundry, clean his room, and read a road atlas are not inconsistent with a valid

IQ of 68).  For a person with a moderate intellectual disability, "participation in all

household tasks can be achieved by adulthood, although an extended period of teaching is

needed, and ongoing supports will typically occur."  DSM-5 at 35.

Plaintiff is capable of some personal care and household tasks.  He lives by

himself in a house that he inherited from his parents.  He is able to make a sandwich for

breakfast, mow his grass (with a riding lawnmower), do laundry, and go to the grocery

store (alone and sometimes with his girlfriend).  (Doc. #7, *PageID* #98).  However,

Plaintiff struggles with banking and money management.  His girlfriend, brother, and

sister give him money, and his girlfriend pays the bills.  The three of them also check on

13

him "all the time, constantly." *Id.* at 109-10.  In other words, "Basically my family takes

care of me …." *Id.*  He relies on their help: for example, if his girlfriend does not remind

him to take his medication, he forgets to take it.  *Id.* at 357.

Likewise, individuals with intellectual disabilities are capable of employment—

even semi-skilled employment.  For an individual with a mild intellectual disability,

"competitive employment is often seen in jobs that do not emphasize conceptual skills"

and support is needed "to learn to perform a skilled vocation competently."  DSM-5 at

34.  By comparison, an individual with moderate intellectual disability can achieve

"[i]ndependent employment in jobs that require limited conceptual and communication

skills …, but considerable support from ... others is needed to manage social

expectations, job complexities, and ancillary responsibilities such as scheduling,

transportation, health benefits, and money management." *Id.* at 35.

Indeed, courts have found claimants whose work history is limited to unskilled or

semi-skilled jobs is not inconsistent with the deficits in adaptive functioning described by

listing 12.05(C).  *See, e.g., Brown*, 948 F.2d at 270 (finding that work as truck driver—

including recording mileage, hours, and places—is not inconsistent with mild intellectual

disability); *Whitehead v. Comm'r of Soc. Sec.*, No. 13-1231-T, 2014 WL 3952839, at *5

(W.D. Tenn. Aug. 13, 2014) ("Plaintiff's past relevant work was classified as heavy,

semi-skilled work. … [N]either sawing trees or loosening and tightening wheel lug nuts

suggests intellectual capacity beyond that found by the psychologists who examined

14

Plaintiff and who each concluded that he met the diagnostic criteria for mild mental retardation.").

By comparison, courts have also found claimants whose work includes "complicated tasks" do not demonstrate deficits in adaptive functioning. *See, e.g., Carmack v. Barnhart*, 147 F. App'x 557, 560-61 (6th Cir. 2005) ("Carmack's work history, which demonstrates her ability to perform complex tasks, belies her claim of mental retardation."); *Daniels*, 70 F. App'x at 872-73 ("Plaintiff … possesses prior work experience in a movie theater, as a hair stylist, and as a school bus driver; i.e., her … work experience demonstrate[s] an ability to perform relatively complicated tasks.") (citation and internal quotation marks omitted); *Foster*, 279 F.3d at 355 ("Foster's work as an accounting clerk at a bank and a liquor store clerk prior to injuring her leg demonstrate that she had the ability to perform relatively complicated tasks prior to the injury to her leg ….").

In the past fifteen years, Plaintiff has had two jobs that constitute substantial gainful activity: one semi-skilled job—tow-truck operator—and one unskilled job—truck driver helper. (Doc. #7, *PageID* #s 117-20). ALJ Anschuetz found that Plaintiff's ability to work at a semiskilled job (and his ability to complete tests at the consultative exam) was indicative of his ability to follow instructions. *Id.* at 67. And, because he can follow directions, the ALJ concludes, he cannot show that he has deficits in adaptive functioning.

In reaching his conclusion, the ALJ does not identify any complicated or complex tasks required by Plaintiff's past jobs. Nor does he explain how Plaintiff's past job a tow-truck driver suggests adaptive functioning beyond that of someone with an intellectual disability. Moreover, the ALJ fails to acknowledge that Plaintiff worked for several different tow-truck companies and was "dismissed" from many of them because of "[e]ither missed work or just poor performance." *Id.* at 92. Indeed, Plaintiff reported to Dr. Jones that "[h]is comprehension and memory were problematic for him when he was employed and in school. He recalls being reprimanded for failing to follow instructions in both settings." *Id.* at 357. Dr. Jones observed during her examination of Plaintiff, "He did not consistently understand the intent of examiner inquiry and consequently was not always able to follow through with tasks after initial directions." *Id.* at 357. Together, this evidence establishes that Plaintiff has deficits in the practical domain of adaptive functioning consistent with intellectual disability

Looking next to the conceptual (academic domain)—it "involves competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations, among others." DSM-5 at 37. The academic records discussed above indicate Plaintiff had deficits in the "conceptual (academic) domain" as a student. Plaintiff's statements to Dr. Jones about his education are consistent with those academic records. For instance, he reported that he "was classified as a slow learner all through school and was eligible for special education services" in school. (Doc. #7, *PageID* #355). Additionally, Dr. Jones observed, "He has

16

not even mastered the skill of one-to-one correspondence.  He had difficulty with simple addition, and mental subtraction."  *Id.* at 358.  She opined that because Plaintiff's "mental calculative abilities proved minimal[,] [s]hould benefits be granted, he would require assistance in managing them in his own best interest."  *Id.* at 359.

Together, this evidence shows Plaintiff's significantly subaverage intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period as Listing 12.05C requires.

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.[4]

## VI.    **Remand for Benefits**

Remand is warranted when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right.  *Bowen*, 478 F.3d at 746.  Remand for an ALJ's failure to follow the regulations might arise, for example, when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff's credibility lacking, *Rogers*, 486 F.3d at 249.

---

[4] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's other challenges to the ALJ's decision is unwarranted.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991).  Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits.  *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994).  The latter is warranted "only where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking." *Felisky*, 35 F.3d at 1041 (quoting *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994)).

In the present case, the evidence of record establishes that a remand for award of benefits is warranted because the record contains overwhelming evidence, or strong evidence while contrary evidence is lacking, that Plaintiff met the criteria of Listing 12.05C.

## IT IS THEREFORE RECOMMENDED THAT:

1.      The Commissioner's non-disability finding be reversed;

2.      The case be **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for payment of benefits;

3.      The case be terminated on the docket of this Court.

July 19, 2018                                            *s/Sharon L. Ovington*
                                                                Sharon L. Ovington
                                                                United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981).